UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                          Chapter 11

ADIR M. CORP.,                                  Case No. 09-15062 (MG)

                        Debtor.

------------------------------------------------------------x

**~~SECOND~~THIRD AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH ~~DEBTOR'S~~THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL *BUT HAS NOT YET BEEN APPROVED BY THE COURT.***

~~THE MORRISON LAW OFFICES, PC~~
~~2 Grand Central Tower~~
~~140 East 45th Street, 18th~~**PICK & ZABICKI LLP**
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) ~~655-3582~~695-6000
~~Attn:  Lawrence F. Morrison~~Douglas J. Pick, Esq.

~~*Proposed*~~ Eric C. Zabicki, Esq.

*Counsel to the Debtor ~~and~~*
~~*Debtor in Possession*~~

Dated: ~~September 16~~November 8, 2011

THE MORRISON LAW OFFICES, PC
Lawrence F. Morrison, Esq.
2 Grand Central Tower
140 East 45th Street, 18th Floor
New York, New York 10017
(212) 655-3582
*Proposed Counsel for the Debtor and*
*Debtor in Possession*

---

In re:                                                    Chapter 11

ADIR M. CORP.,                                   Case No. 09-15062(MG)

                         Debtor.
                                          x
---

## I.        PURPOSE OF THIS DISCLOSURE STATEMENT

Adir M. Corp., the debtor and debtor-in-possession herein (~~collectively,~~ the "Debtor"), provides this ~~disclosure statement~~Third Amended Disclosure Statement (the "Disclosure Statement"), pursuant to §1125(b) of title 11 of the United States Code (the "Bankruptcy Code"), to all of its known creditors and other parties in interest for the purpose of soliciting acceptances of its proposed Third Amended Chapter 11 Plan of Reorganization (the "Plan"). The Plan has been filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and a copy of the same is attached hereto as *Exhibit "A"*. By Order dated ~~September~~ December ___, 2011, this Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Debtor's creditors to make an informed decision whether to accept or reject the Plan.

**The Debtor strongly urges that you read this Disclosure Statement because it contains a summary of the Plan provisions and important information concerning the**

**Debtor's financial affairs, the administration of the Debtor's bankruptcy estate and the anticipated recovery by creditors of the Debtor.** Capitalized terms utilized, but not defined herein, have the meanings ascribed to them in the Plan.

Briefly, and as more fully discussed at length herein, the Plan provides for a reorganization of the Debtor's financial obligations and affairs. ~~Upon confirmation of the Plan, the Debtor shall: (a) immediately pay all Statutory Fees and Allowed Administrative Claims in full or pay such claims on such terms as may be mutually agreed to by the holder of an Allowed Administrative Claim; (b) pay all Allowed Priority Claims pursuant to statute or on such terms as may be mutually agreed to by the holder of an Allowed Priority Claim; (c) make monthly payments of $3,000 to Sovereign Bank over a term of (3) years, the full terms of which are provided for in the Plan pursuant to a stipulated order granting the Debtor authority to use Sovereign Bank's cash collateral; (d) make monthly payments of $3,000 to Avi Galapo pursuant to a stipulation agreed upon between him and the Debtor, the terms of which are incorporated in the Plan, and (e) pay all Allowed General Unsecured Claims 5.51% of the Allowed Amount of their respective claims in full satisfaction of said Claims, in three (3) annual payments of $17,000, the first to be made on the Effective Date. The initial Effective Date distributions contemplated to be made under the Plan shall be funded from the Debtor's business earnings. The post Effective Date installments to be made shall be made from the Debtor's future business earnings.~~ Under the Plan, the Debtor proposes to:

~~The~~ (a) pay all Statutory Fees, estimated to total not more than $4,875.00, in full on the Effective Date of the Plan;

(b) pay all Allowed Administrative Claims, estimated to total $91,000.00, in full either on the Effective Date of the Plan or in monthly installment payments

Formatted: Top: 1", Bottom: 1"

pursuant to agreements that have been or are anticipated to be made between the Debtor ~~urges all voting~~and the holders of such claims;

(c)    pay all Allowed Priority Tax Claims, estimated to total $66,850.88, in full and with interest at the rate of 5% per annum, in thirty-two (32) equal monthly installments each totaling $2,235.80;

(d)    pay Sovereign Bank, as the holder of an Allowed Class 1 ~~Claims,~~ Secured Claim, a total of $112,237.46 (less any adequate assurance payments made by the Debtor prior to the Effective Date) in thirty-six (36) monthly installments of $3,517.11, and as more fully provided for in a stipulation and order previously approved by the Bankruptcy Court in connection with the Debtor's use of Sovereign Bank's cash collateral during the Chapter 11 Case;

(e)    pay Avi Galapo, as the holder of an Allowed Class 2 ~~Claims, and Allowed Secured Claim,~~ a total of $141,000.00: (a) by way of the release of any funds deposited by the Debtor into escrow with Mr. Galapo's counsel, estimated to total not less than $15,000.00, on the Effective Date; (b) an initial installment payment of $4,000.00 on the Effective Date; (c) twelve (12) monthly installments of $4,000.00 each through December, 2012; and (d) twenty-six (26) monthly installments of $3,000.00 each from January, 2013 through February, 2015, and as more fully provided for in a stipulation of settlement previously approved by the Bankruptcy Court;

(f)    pay the holders of Allowed Class 3 General Unsecured Claims a total of $55,000.00, representing approximately 6% of their Allowed Claims, by way of three (3) consecutive annual Pro Rata Distributions of the sum of $18,333.33 each with the first occurring on the Effective Date of the Plan and, thereafter, on the first and second anniversary dates of the Effective Date, in full satisfaction of said claims; and

(g)    the retention by Meir Maslavi of his Interests (*i.e.*, stock) in the Debtor.

The Effective Date shall be the first business day which is fourteen (14) days after the entry of the Confirmation Order by the Bankruptcy Court. The initial Effective Date Distributions contemplated to be made under the Plan shall be funded from amounts accumulated by the Debtor from its operations during the Chapter 11 Case. The post-Effective Date installment payments and Distributions shall be made from the Post-Confirmation Debtor's future business earnings.

Detailed voting instructions are provided with the Ballot accompanying this Disclosure

**Formatted:** Indent: First line:  0.5"

Statement. Briefly, to vote on the Plan, a voting holder of an Allowed Claim in Class 1, Class 2, or Class 3 must complete the Ballot and mail it so that it is received no later than the Voting Deadline, which is 5:00 p.m. (Prevailing Eastern Time) on December __, 2011, at Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, Attn: Douglas J. Pick, Esq. Votes may not be transmitted orally, by facsimile or by e-mail. If a Ballot is damaged or lost, you may contact Pick & Zabicki LLP at (212) 695-6000 to receive another. Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted. Accordingly, the Debtor urges all voting holders of Allowed Claims in Class 1 in, Class 2 and Class 3 to promptly return their signed and completed Ballots. A hearing to consider the Debtor's request for Confirmation of the Plan will be held at the United States Bankruptcy Court for the Southern District of New York, before the Honorable Martin Glenn, One Bowling Green, New York, New York 10004, on October December ___, 2011 at _____ a.m./p.m.

The Debtor urges that all creditors entitled to vote, vote in favor of the Plan.

## II. DISCLAIMER

NO PERSON MAY BE GIVEN ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THAT DATE. ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THIS DISCLOSURE STATEMENT BEFORE VOTING FOR OR AGAINST THE PLAN. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL. TERMS USED IN THIS DISCLOSURE STATEMENT BUT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN AND, IF NOT DEFINED IN THE PLAN, THEN IN THE BANKRUPTCY CODE.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS THE EQUIVALENT OF A STATEMENT MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED FROM THE DEBTOR'S BOOKS AND RECORDS AND PUBLIC PLEADINGS. ALTHOUGH DILIGENT EFFORTS HAVE BEEN MADE TO PRESENT ACCURATE AND COMPLETE INFORMATION, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION IS WITHOUT SOME INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR. ANY VALUE GIVEN AS TO ASSETS OF THE DEBTOR IS BASED UPON AN ESTIMATION OF SUCH VALUE. YOU ARE URGED TO CONSULT YOUR OWN COUNSEL AND FINANCIAL AND TAX ADVISORS IF YOU HAVE ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS.

THE DISCLOSURE STATEMENT ORDER, A COPY OF WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, SPECIFIES THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN AND FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN. A FORM BALLOT FOR VOTING ON THE ACCEPTANCE OR REJECTION OF THE PLAN IS ALSO PROVIDED HEREWITH. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE DISCLOSURE STATEMENT ORDER IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**Formatted:** Indent: Left: 0", First line: 0"

## A. What is Chapter 11?

Chapter 11 is the principal reorganizational chapter of the Bankruptcy Code. Under chapter 11, a debtor is permitted a period in which to review its assets and obligations in order to coordinate and reorganize its financial affairs. The provisions of chapter 11 of the Bankruptcy Code also permit a debtor to liquidate or otherwise sell some or all of its assets in aid of its efforts to restructure its obligations.

The commencement of a chapter 11 case triggers the application of the "automatic stay" under §362 of the Bankruptcy Code. The automatic stay halts, with certain exceptions, substantially all attempts to collect pre-petition claims from the debtor and/or interference with the debtor's property. This provides the debtor with a respite from creditors' collection efforts so that it can address its affairs in an orderly fashion. It also promotes the Bankruptcy Code's goal of equality among similarly situated creditors.

## B. What is a Plan?

The principal purpose of a chapter 11 case is to permit the formulation of a plan which provides for the restructuring of the debtor's liabilities and the treatment of its equity interests. In this regard, a plan is akin to a contract between its proponents and the debtor's creditors and parties in interest. Once "confirmed" (*i.e.*, approved) by the court, a plan is binding upon all creditors and parties in interest.

### C. What is a Disclosure Statement?

After a plan has been proposed, the holders of claims against and interests in the debtor that are impaired by the terms of the plan and that are to receive distributions under the plan are entitled to vote on whether to accept or reject the plan. In this regard, the Bankruptcy Code requires that the proponents of a plan provide disclosure of "adequate information" to all such voting creditors and equity holders by way of a court approved "disclosure statement" before votes on the plan may be solicited. Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

The Debtor presents this Disclosure Statement to the voting holders of Allowed Claims against the Debtor in order to satisfy the disclosure requirements of the Bankruptcy Code by providing each voting holders of claims and interests entitled to vote with sufficient information to make an informed decision as to whether to vote to accept or reject the Plan.

### D. How Do I Vote?

Under the Bankruptcy Code, only persons holding allowed claims in classes that are impaired under the terms of a plan, and that are to receive a distribution thereunder, are entitled to vote. Creditors are not entitled to vote if their contractual rights are unimpaired under the terms of a plan or if they will receive no property thereunder.

Under the Plan proposed by the Debtor, holders of Class 1, Class 2 and Class 3 Claims are impaired. Class 1 represents the impaired claim of Sovereign Bank. The Debtor previously negotiated a restructuring of Sovereign Bank's secured claim pursuant to a so ordered

stipulation, which is incorporated by reference under the Plan and annexed hereto as *Exhibit "D"*. Therefore, holders of Class 1 Claims can vote for the plan. Class 2 represents the Allowed Claim of Avi Galapo ("Galapo"). The Debtor previously negotiated a restructuring of Galapo's claim pursuant to an agreement settling the adversary proceeding initiated by Galapo against the Debtor, which is incorporated by reference under the Plan. Therefore, holders of Class 2 Claims can vote for the Plan. Class 3 represents the Allowed General Unsecured Claims. Class 3 Claims are impaired under the Plan because they have agreed to accept less than the full amount actually owed. Therefore, holders of Class 3 Claims can vote on the Plan. The holders of Administrative and Priority Tax Claims (which Claims are not classified under the Plan) are not entitled to vote on the Plan since their interests are not being impaired or affected thereby.

Under the Bankruptcy Code, acceptance of the Plan would require an affirmative vote of at least one-half of the total Allowed Claims actually voting within a Class and two thirds of the total allowed amounts of the Allowed Claims actually voting within this same Class. Should a Class not affirmatively vote in favor of the Plan, then the chapter 11 case will either be converted to a chapter 7 proceeding, dismissed or, with the Court's permission, the Plan may be further amended as may be necessary to achieve confirmation.

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement. Briefly, to vote on the Plan, a voting holder of an Allowed Claim in Class 3 must complete the Ballot and mail it so that it is received no later than the Voting Deadline, which is 5:00 p.m. (Prevailing Eastern Time) on October ___, 2011 at The Morrison Law Offices, 140 East 45th Street, New York, New York 10017, Attn: Lawrence Morrison, Esq. Votes may not be transmitted orally, by facsimile or by e-mail. If a Ballot is damaged or lost, you may contact The Morrison Law Offices, PC at (212) 655-3582 to receive another. Any Ballot that is executed and

returned but which does not indicate an acceptance or rejection of the Plan will not be counted. Accordingly, the Debtor urges all voting holders of Allowed Claims in Class 1 and Class 2 to promptly return their signed and completed Ballots.

**Formatted:** Left

**III.**    **BACKGROUND CONCERNING THE DEBTOR, THE BANKRUPTCY FILING AND THE ADMINISTRATION OF THE DEBTOR'S ESTATE**

**A. Background Concerning the Debtor and its Bankruptcy Filing**

The Debtor is a business corporation which was formed under the ~~owner/operator~~laws of the State of New York on September 19, 2003.  Since that time, the Debtor has been engaged in the operation of a takeout restaurant named Miro Café ~~located at 595 Broadway, New York, New York 10012~~. The Debtor serves sandwiches, salads, sushi and various beverages including soft drinks and various types of coffee. ~~The circumstances leading to the Debtor's filing of its Petition under chapter 11 of the Bankruptcy Code was precipitated by the loss of sales due to the nation's broad economic downturn.  The Debtor operates in the Soho area of New York County, New York which has seen a decline in foot traffic to its area and an approximately 15% percent decrease in its business~~ The Debtor's ongoing operations are managed by its founder, sole shareholder and sole officer and director, Meir Maslavi.

~~On August 19, 2009, the Debtor filed for bankruptcy protection.~~

~~Upon its chapter 11 filing, the Debtor retained the law firm of Meister Seelig & Fein, LLP as their counsel who immediately began assisting the Debtor in the administration of its bankruptcy estate.~~The Debtor operates its business from certain leased premises located at 594 Broadway, New York, New York 10012 (the "Premises").  The Premises consist of a portion of the ground floor retail space and basement at said address (approximately 1,000 square feet).  The Debtor's use and occupancy of the Premises is provided for in and is subject to the terms of a commercial lease agreement dated January 29, 1992 (as assigned to the Debtor on or about January 1, 2004 and as amended from time to time, the "Lease") with 594 Broadway Associates, LLC, as landlord (the "Landlord").  An unsuccessful pizza parlor (Piccoloa Pizza Soho, Inc.) had previously operated from the Premises and the Debtor agreed to pay the owners thereof a total of $300,000.00 as "key money" to acquire the Lease and certain restaurant equipment.  The term of

the Lease is presently due to expire on February 28, 2015.  The current base rent payable under the Lease is $21,161.00 which is scheduled to escalate to $21,669.00 per month in the final year of the Lease term.

The Debtor had borrowed certain amounts from Avi Galapo in connection with its start-up and initial operations.  In 2005, Mr. Galapo commenced an action against the Debtor in the Supreme Court of the State of New York, County of New York, titled *Avi Galapo v. Meir Moslavi, individually, and as an officer of Adir M. Corp., Adir M. Corp., John Doe, Jane Doe and XYZ Corp.*, Index No. 601741/05 (the "Galapo Action"), seeking to recover the amounts borrowed by the Debtor.  On or about March 29, 2006, Mr. Galapo and the Debtor entered into a stipulation of settlement pursuant to which, and among other things, the Debtor agreed: (a) to pay Mr. Galapo the aggregate sum of $900,000.00 pursuant to an agreed upon schedule; and (b) to execute an assignment of the Lease to Mr. Galapo which was to be released from escrow upon any uncured payment default under the stipulation of settlement.  On or about February, 2008, the Debtor and Mr. Galapo entered into a modification of the stipulation of settlement and, as a result thereof, and among other things, the Debtor was required to make eighteen (18) monthly payments in the amount of $17,746.96 to Mr. Galapo commencing on December 1, 2008.  The Debtor subsequently defaulted under the modified settlement terms resulting in the full balance of the settlement amounts owed, then totaling in excess of $300,000.00, becoming due and payable as of June 1, 2009.  Shortly thereafter, Mr. Galapo demanded that the contingent assignment of the Lease be released from escrow.

In the interim, during the course of its operations, and on or about January 14, 2008, the Debtor and Sovereign Bank entered into two separate Business Loan Agreements pursuant to

which Sovereign Bank agreed to loan the Debtor the total principal sum of $100,000.00. On or about that same date, the Debtor executed and delivered to Sovereign Bank: (a) a promissory note in the principal sum of $41,000.00; (b) a promissory note in the principal sum of $59,000.00 (together, the "Notes"); and (c) two separate Commercial Security Agreements (together, the "Security Agreements") granting Sovereign Bank a first priority security interest in all of the Debtor's existing and after acquired assets (collectively, the "Collateral") as security for the repayment of the amounts owed to Sovereign Bank including, without limitation, all physical assets, monies and accounts receivable of the Debtor. On January 24, 2008, Sovereign Bank filed a UCC-1 Financing Statement with the New York State Department of State thereby perfecting its security interest in the Collateral. The amounts owed by the Debtor to Sovereign Bank are further secured by certain personal guaranties executed by Meir Moslavi in favor of Sovereign Bank. Unfortunately, the Debtor was not able to remain current with regard to its obligations to Sovereign Bank.

The Debtor's inability to pay its debts as they matured was due largely to decline in its business resulting from the broad, global economic downturn. The Debtor is located in Manhattan's "Soho" neighborhood which has seen a decline in foot traffic and an approximately 15% percent decrease in its business. Facing the imminent loss of its Lease to Mr. Galapo and the likely seizure and forced liquidation of its assets by Sovereign Bank, the Debtor consulted with counsel to discuss the commencement of a chapter 11 bankruptcy proceeding. The Debtor determined that, given a respite from the collection efforts of its creditors and an opportunity to negotiate payment terms with Mr. Galapo and Sovereign Bank, it could successfully reorganize its financial affairs and continue to operate profitably going forward.

Accordingly, on August 19, 2009 (the "Petition Date"), the Debtor sought relief under chapter 11 of the Bankruptcy Code.  Shortly thereafter, the Debtor filed its Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs (the "Schedules") with the Bankruptcy Court pursuant to Rule 1007(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtor remains in possession of its property and continues to operate and manage its business and affairs as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  No committee, trustee or examiner has been appointed with regard to the Debtor's case.  ~~Throughout this proceeding, the Debtor has endeavored to maximize value to the estate through a workable and successful reorganization of the Debtor's affairs.~~

**B.**     **Administration of the ~~Debtors'~~Debtor's Estate**

Immediately following its chapter 11 filing, the Debtor retained the law firm Meister Seelig & Fein LLP ("MSF") to serve as its general bankruptcy counsel.  On November 1, 2011, MSF was granted leave to withdraw as counsel to the Debtor and the Debtor was authorized to retain the law firm Pick & Zabicki LLP as its substitute counsel.  The Debtor also utilized the services of the accounting firm Rosen Seymour Shapss Martin & Company, LLP.  The Debtor's application seeking to authorize said retention is pending before the Bankruptcy Court.

The Debtor began the administration of its chapter 11 case by conducting an investigation of its assets to determine whether any value could be obtained therefrom for the benefit of its creditors.  By way of its Schedules, the Debtor had listed certain personal property having an estimated value of $113,490.28 and consisting primarily of amounts then held in cash and in its operating checking account ($8,490.28), tables and chairs ($5,000.00) and restaurant equipment

**Formatted:** Indent: First line:  0", Tab stops: Not at  -0.75" +  -0.5" +  0" +  0.5" + 1" + 1.5" +  2.06" +  2.5" +  3" +  3.5" +  3.75"

($100,000.00).  As discussed above, all of the Debtor's existing and after acquired assets are encumbered by the first priority security interest granted by the Debtor to Sovereign Bank and, thus, substantially all of the proceeds of any sale of the Debtor's assets would merely be paid to Sovereign Bank against its secured debt.  In this regard, the Debtor further believes that any liquidation sale of its restaurant equipment (much of which is approximately 8 years old) would yield substantially less than the estimated value thereof listed by the Debtor in its Schedules. Additionally, the Lease is encumbered by the contingent assignment in favor of Mr. Galapo as security for the amounts owed to Mr. Galapo by the Debtor and, thus, any "sale" of the Lease by the Debtor would be extremely problematic and would need to yield net proceeds in excess of what is owed to Mr. Galapo. Moreover, the tables, chairs, restaurant equipment and the like listed by the Debtors is necessary for the Debtor's day-to-day operation of its business and, thus, any sale thereof would likely result in the immediate cessation of its operations.  Accordingly, the Debtor and its professionals ~~subsequently~~concluded that the Debtor's assets could not reasonably be utilized to fund a chapter 11 plan.  A detailed "Chapter 7 Liquidation Analysis" concerning the Debtor's assets is attached hereto as *Exhibit "B"* (the "Liquidation Analysis").

The Debtor then conducted an investigation of its anticipated future operating income to determine whether it could reasonably make distributions to its creditors therefrom while permitting the Debtor to operate profitably.  Although the Debtor's revenues vary from month to month, the Debtor generally turns a small profit each month after payment of its ongoing operating expenses.  Accordingly, the Debtor and its professionals determined that, if a significant amount of money could be accumulated from which an initial distribution to creditors could be made under a plan, the Debtor would be able to reasonably fund any ongoing plan

payments while remaining current on its ongoing non-plan obligations from its future operating income. A detailed set of "Cash Flow Projections" forecasting the Debtor's post-Confirmation operating receipts and disbursements is hereto as *Exhibit "C"* (the "Projections").

Formatted: Top: 1", Bottom: 1"

In furtherance of the foregoing strategy, and on March 22, 2010, the Debtor filed a motion seeking to assume the Lease pursuant to the terms of a stipulation entered into with the Landlord. Said motion was granted by Order entered by the Bankruptcy Court on April 27, 2010. As a condition to the Debtor's assumption of the Lease, the Debtor paid to the Landlord a total of $22,005.22 in rent arrears owed under the Lease as of March 1, 2010. The Debtor has remained current on its obligations to the Landlord under the Lease subsequent to the Debtor's assumption thereof.

Additionally, the Debtor sought and obtained an Order, dated January 6, 2010, from the Bankruptcy Court setting February 26, 2010 as the last date by which proofs of claim for pre-petition obligations of the Debtor had to be filed. A notice of the same was mailed to all known creditors of the Debtor. In addition to the liquidated, non-contingent and/or undisputed claims identified in the Schedules, a total of fourteen (14) proofs of claim were filed against the Debtor (excluding proofs of claim that were merely amendments to previously filed claims). The Debtor and its professionals undertook an analysis ~~of the claims reflected in the Debtor's Schedules and those~~ with regard to the scheduled and filed claims in an effort to reconcile the same. It was ultimately concluded that the filed proofs of claim substantially comported with the Debtor's books and records and, thus, no objections to claims were immediately filed. The Debtor does not anticipate that any objections to claims will be brought post-Confirmation.

Significantly, on December 15, 2009, Sovereign Bank filed a proof of claim in the

Debtor's case asserting a secured obligation totaling $90,500.99 (representing the principal balances and accrued interest under the Notes discussed above as of the Petition Date), and ~~further~~ asserted ~~by way of proofs of claim filed with the Bankruptcy Court in order to assess the merits of those claims and with the ultimate goal of minimizing the overall amount of claims~~ that the Debtor was obligated to pay Sovereign Banks' attorneys' fees in accordance with the loan documents.  As a result of Sovereign Bank's first priority security interest in all of the Debtor's assets, the Debtor's ongoing operating revenues represented Sovereign Bank's "cash collateral". As such, the Debtor and Sovereign negotiated and entered into a stipulation (the "First Cash Collateral Stipulation") authorizing, among other things, the Debtor to use certain of the Sovereign Bank's cash collateral on an ongoing basis and directing the Debtor to make "adequate assurance" payments of $3,000.00 to Sovereign Bank each month against the amounts owed.  The First Cash Collateral Stipulation was approved by the Bankruptcy Court on January 31, 2011.  Unfortunately, the Debtor was not able to pay Sovereign Bank the adequate assurance payments due for the months of March, 2011 and April, 2011 and, as a result thereof, Sovereign Bank was granted relief from the automatic stay and commenced an action against the Debtor in non-bankruptcy court seeking to foreclose upon the Collateral.

Upon further negotiations and discussions, the Debtor and Sovereign Bank entered into a second stipulation (the "Second Cash Collateral Stipulation", a copy of which is attached hereto as *Exhibit "D"*) which was approved by the Bankruptcy Court on May 26, 2011.  Pursuant to the Second Cash Collateral Stipulation, and among other things, the Debtor was permitted to continue to use Sovereign Bank's cash collateral conditioned on: (a) the Debtor's payment of adequate assurance of $3,000.00 each month from June 1, 2011 through the date that a plan is confirmed; (b) that any plan proposed by the Debtor provide for Sovereign Bank to have an

allowed secured claim as asserted ~~against~~ in its proof of claim (less any payments received), plus $9,000.00 representing the adequate assurance payments for March, April and May, 2011, and together with Sovereign Bank's attorneys' fees; and (c) that Sovereign Bank's secured claim be paid in monthly installments over a term of three (3) years with interest at the rate of 8% per annum. The Debtor has remained current with regard to the adequate assurance payments required to be made under the Second Cash Collateral Stipulation.

Additionally, on February 25, 2010, Avi Galapo filed a proof of claim against the Debtor asserting a secured obligation totaling $280,216.70 representing the amounts owed by the Debtor to Mr. Galapo under the settlement reached in the Galapo Action. Thereafter, and on July 20, 2010, Mr. Galapo commenced an adversary proceeding against the Debtor in the Bankruptcy Court (Adv. Proc. No. 10-03369 (MG)) seeking a declaratory judgment as to his alleged right to the release of the contingent assignment of the Lease from escrow as a result of the Debtor's default. On August 20, 2010, the Debtor filed an answer to Mr. Galapo's complaint generally denying his purported entitlement to the release of the contingent lease assignment and asserting numerous affirmative defenses to the relief sought. On or about September 9, 2011, and following extensive discussions and negotiations, the Debtor and Mr. Galapo entered into a stipulation of settlement (the "Galapo Settlement Stipulation", a copy of which is attached hereto as *Exhibit "E"*) concerning the adversary proceeding and Mr. Galapo's claims. Pursuant to the Galapo Settlement Stipulation, the Debtor agreed to pay Galapo a total of $141,000.00 as follows: (a) $3,000.00 on September 1, 2011 (paid and currently held in escrow); (b) $4,000.00 per month from October 1, 2011 (paid and currently held in escrow) through December 1, 2012; and (c) $3,000.00 per month from January 1, 2013 through February 1, 2015. On September 9, 2011, the Debtor filed a motion with the Bankruptcy Court seeking approval of the terms of the

Galapo Settlement Stipulation which motion is anticipated to be granted in early November, 2011.

As a result of, among other things, the favorable terms of the Debtor's agreements with Sovereign Bank and Mr. Galapo, the Debtor believes that it will be able to successfully emerge from chapter 11 while remaining profitable going forward. The illustrations above are merely a sampling of the numerous steps taken during the administration of the Debtor's estate. The Debtor's estate has been fully administered with an eye toward maximizing the value of the Debtor's assets and operations for all creditors. Accordingly, the Debtor now proposes the Plan to its known creditors and parties in interest.

## IV.    OVERVIEW OF THE PLAN

**Formatted:** No underline

### A.    Generally

~~As hereinafter more fully discussed, the Plan proposed by the Debtor provide for, among other things:~~

~~(a)    the payment in full of all Statutory Fees on the Effective Date of the Plan;~~

~~(b)    the payment in full of all Allowed Administrative Claims on such terms as are mutually agreed to by the holder of an Allowed Administrative Claim and the Debtor;~~

~~(c)    the payment by the Debtor to holders of Priority Claims, in accordance with statutory authority;~~

~~(d)    the monthly payment of $3,000 by the Debtor to Sovereign Bank in accordance with terms and conditions as set forth in the Plan;~~

~~(d)    the Debtor has paid the sum of $3,000.  The Debtor shall pay to Galapo $4,000 per month (payment to be made on the first of every month) beginning October 1, 2011 and ending December 1, 2012.  The Debtor shall pay to Galapo $3,000 per month (payment to be made on the first of every month) beginning January 1, 2012 and ending February 1, 2015.  These payments are in accordance with terms and conditions as set forth in the plan;~~

~~(e)    a distribution to the holders of Allowed General Unsecured Claims equaling 5.51% percent of the amounts of their Allowed Claims in full satisfaction of said Claims, which is to be made in three (3) annual payments of $17,000, the first to be made on the Effective Date.~~

~~(f)    Equity Security Holder Meir Maslavi would maintain his 100% interest in the Debtor following Confirmation of the Plan.  If the unsecured creditors reject the plan then Meir Maslavi cannot retain his equity interest.~~

The overall purpose of the Plan is to distribute value to the Debtor's creditors on a fair and equitable basis and in accordance with the priorities established by ~~which agreement~~law and/or by ~~law~~agreement.  The Plan represents the culmination of the analyses conducted and efforts expended by the Debtor and its professionals concerning the best means to maximize and allocate value to the Debtor's ~~unsecured~~ creditors.  The Debtor has determined that the Plan

provides the highest value to creditors and greatly exceeds any value that might otherwise be achievable in a liquidation under chapter 7 of the Bankruptcy Code. Accordingly, the Debtor recommends that the Plan be accepted by its creditors.

**B.     Summary of Classification and Treatment of Claims and ~~Equity~~ Interests**

Under the Plan, Claims and Interests against the Debtor are grouped into Classes according to their similarity with other Claims and their relative legal and contractual priorities. Under the Bankruptcy Code, only the holders of Allowed Claims are entitled to vote and to receive distributions under the Plan. The classification and treatment of such Claims are summarized below. All Claims other than Statutory Fees, Administrative Claims and Priority Tax Claims, are placed in Classes under the Plan. The Debtor believes that this classification scheme is consistent with the requirements of the Bankruptcy Code.

**1.     Statutory Fees**

The Debtor (and the Post-Confirmation Debtor) has a statutory duty to pay all outstanding amounts that may be due to the United States Trustee upon ~~confirmation~~Confirmation, together with any fees due pursuant to 28 U.S.C. §1930(a)(6) through the date of the entry of a ~~Final Decree~~final decree closing the chapter 11 case, conversion of the case to chapter 7 or dismissal of the case. ~~The Debtor estimates that the unpaid statutory fees will not exceed $2,000 as of the eventual entry of a Final Decree.~~

As of the date hereof, the Debtor is current with regard to its obligations to the United States Trustee (through the third quarter of 2011). The Debtor estimates that the unpaid statutory fees will not exceed $4,875.00 as of the Effective Date of the Plan (representing amounts owed on disbursements made in the fourth quarter of 2011, including the amounts proposed to be disbursed on the Effective Date). Statutory Fees that are due on or prior to the Effective Date of

the Plan shall be paid on the Effective Date or as soon thereafter as reasonably practicable. Statutory Fees that may become due after the Effective Date shall be paid as they become due by the Post-Confirmation Debtor until the entry of a final decree closing the chapter 11 case, conversion of the case to chapter 7 or dismissal of the case.

**2.      Administrative Claims**

Administrative Claims are defined in the Plan as the costs and expenses of administration of the Debtor's chapter 11 case incurred on or after the Petition Date, and (except as to post-Petition Date obligations incurred and/or paid by the Debtor in the ordinary course of its business) allowed by final order under §503(b) of the Bankruptcy Code.  These ~~Claims~~claims include, without limitation, any actual and necessary expenses: (a) of preserving the estate of the Debtor; (b) any indebtedness or obligation incurred or assumed by the Debtor in connection with the conduct of its business or for the acquisition or lease of property or for the procurement of services; (c) any costs and expenses of the Debtor and/or the Post-Confirmation Debtor for the management, maintenance, preservation, sale or other disposition of any assets; (d) the administration and implementation of the Plan; (e) the administration, prosecution or defense of claims by or ~~Claims~~claims against the Debtor and for distributions under the Plan; and (f) any allowances of professional compensation and reimbursement of expenses to the extent allowed by an order of the Bankruptcy Court, whether arising before or after the Effective Date.

In accordance with certain mandatory provisions of the Bankruptcy Code, the Plan provides that holders of Allowed Administrative Claims will be entitled to full payment of their Claims: (a) in cash on the Effective Date or as soon thereafter as is practicable; or (b) on such terms as are mutually agreed to by the holder of an Allowed Administrative Claim and the Debtor.  Thus, Allowed Administrative Claims are unclassified under the Plan and holders of

Allowed Administrative Claims are not entitled to vote on the acceptance or rejection of the Plan. ~~If there is no significant litigation initiated or objections filed with respect to confirmation of the Plan, and the Plan is confirmed within the next thirty to ninety days, it is estimated that the Allowed Administrative Claim is comprised of the following amounts:~~

The only known potential Administrative Expense Claims are the amounts owed by the Debtor to its current and former professionals on account of professional services rendered and reimbursable expenses incurred. If there is no significant litigation initiated or objections filed with respect to Confirmation of the Plan, and the Plan is confirmed within the next thirty (30) to ninety (90) days, and subject to the approval of the Bankruptcy Court, **the Debtor and its current professionals have agreed** to the following treatment of said professionals' Allowed Administrative Claims:

| Claimant | Amount | ~~Comments~~Description | Agreed Upon Treatment |
|---|---|---|---|
| ~~Meister Seelig & Fein,~~Pick & Zabicki LLP | ~~$135~~$20,0 00.~~00~~.00 | ~~Approximate~~Estimated Fees and Expenses to be Requested as Substitute Counsel to the Debtor. | Full payment in four (4) consecutive monthly installment payments of $5,000.00 each beginning on the Effective Date of the Plan. |
| Rosen Seymour Shapss Martin & Company, LLP | $5,000.00 | Estimated Fees and Expenses to be Requested as Accountants to the Debtor. | Full payment in five (5) consecutive monthly installment payments of $1,000.00 each beginning on the Effective Date of the Plan. |
| **Total:** | ~~$135~~**$25,0 00.~~00~~.00** | | |

~~Counsel~~    The actual amounts of the Allowed Administrative Claims of the above-named

professionals may increase or decrease from the amounts listed above prior to the Effective Date and are subject to, among other things, the approval thereof by the Bankruptcy Court upon the submission of appropriate applications for allowances of compensation and reimbursement of expenses by the above-listed professionals.

In addition to the above-referenced claims, the Debtor anticipates that its former counsel, MSF, will also be seeking an Allowed Administrative Claim on account of its professional fees and for reimbursement of expenses incurred as counsel to the Debtor.  MSF has advised the Debtor and the Court that it intends to seek an allowance of compensation and reimbursement of expenses for professional services rendered to the Debtor in amounts totaling approximately $135,000.00.  The Debtor has expressed to MSF its disagreement with the amount that it intends to seek and the parties are currently attempting to amicably resolve the amounts owed by the Debtor.  MSF had previouslyalso filed two requests with the Bankruptcy Court seeking awards of interim fee applications.  The first application wascompensation, both of which were voluntarily withdrawn after an Objection wasby MSF as a result of objections filed by the Office of the United States Trustee.  The second was also withdrawn after objections by the Office of the United States Trustee and a limited objection by/or Sovereign Bank.

Under the Plan, MSF has agreed to receive payment equal to 100% of the Allowed Amount of its Claim on such terms as are mutually agreed to by MSF and the Debtor.

Because the Debtor has limited cash on hand it will not be able to pay an award of legal fees in full in the sum of approximately $135,000.00.

The Debtor will have to negotiate a payment arrangement with MSF on or before the confirmation hearing date or it will not be able to confirm its Plan of Reorganization.

~~To the extent that the court reduces the fees and expenses of MSF it is unlikely that the reductions will go to unsecured creditors. Therefore, it is the Debtor's view that a reduction in fees to MSF will not directly impact other creditors.~~

The Debtor is proposing that, and the Plan provides for, MSF to have an Allowed Administrative Claim in the amount of $66,000.00 payable by the Debtor as follows: (a) $22,000.00 on the Effective Date of the Plan; and (b) thirty-eight (38) monthly installments of $1,161.00 each commencing thereafter until fully paid. However, while the Debtor is hopeful that an amicable resolution can be reached, the Bankruptcy Court may ultimately need to adjudicate the amounts, if any, owed by the Debtor to MSF in the context of a final fee application to be filed by MSF. Any amounts ultimately deemed payable by the Debtor to MSF will be treated as Allowed Administrative Claims under the Plan. The amounts proposed to be paid by the Debtor to holders of Allowed General Unsecured claims are fixed under the Plan and, thus, any fluctuation in the amounts payable by the Debtor to MSF will not affect the amounts that may ultimately be recovered by holders of General Unsecured Claims, although the amount of MSF's Allowed Administrative Claim and the terms of the Debtor's payment thereof may affect the Debtor's ability to confirm the Plan.

3. **Priority Tax Claims**

Priority Tax Claims are unclassified under the Plan and include ~~Claims~~claims entitled to priority under §507(a)(8) of the Bankruptcy Code. Generally, Priority Tax Claims are (subject to certain timing and date of assessment limitations) unsecured claims of "governmental units" (as defined in the Bankruptcy Code) based upon: (a) taxes measured by income or gross receipts; (b) property taxes; (c) withholding taxes; (d) employment taxes; (e) excise taxes; (f) customs duties;

**Formatted:** Justified

and (g) penalties based on actual pecuniary losses relating to the foregoing. These Tax Claims include, among others, all taxes measured by income or gross receipts attributable for the relevant period through the Petition Date, as the case may be. There are three Priority Tax Claims: The Internal Revenue Service has filed priority tax proof of claim for $36,074.63; the New York State Department of Taxation and Finance has filed a priority tax proof of claim for $13,512.71; and the New York City Department of Finance has filed a priority tax proof of claim for $18,198.66. The claims of the Internal Revenue Service, the New York City Department of Taxation, and the New York State Department of Taxation and Finance will be paid pursuant to statutory authority. Pursuant to 11 U.S.C. § 1129(a)(9)(C), unless otherwise agreed, the Plan must provide that the holder of a Priority Tax Claim specified in section 507(a)(8), will receive on account of such claim regular installment payments in cash equal to the allowed amount of such claim over a period ending not later than 5 years after the date of the order for relief. *See* 11 U.S.C. § 1129(a)(9)(C). The order for relief was entered on August 19, 2009, so the Debtor will make installment payments that will satisfy in full the allowed amount of these Priority Tax Claims by August 19, 2014. These Priority Tax Claims include, among others, all taxes measured by income or gross receipts attributable to the three-year period immediately preceding the Petition Date (*i.e.*, from August 19, 2006 through the Petition Date).

The Plan provides for payment in full of all Allowed Priority Tax Claims in equal consecutive monthly cash installment payments in an amount equal to the Allowed Priority Tax Claims, with interest at a fixed annual rate equal to 5% (subject to the consent of the taxing authorities to said interest rate), commencing upon the Effective Date and continuing through a period not exceeding five years after the Petition Date (*i.e.*, not later than August 19, 2014) in

accordance with §1129(a)(9)(c)(ii) of the Bankruptcy Code.

The Allowed Priority Tax Claims, and the proposed monthly installment payment amount with regard to each respective holder thereof, are comprised of the following:

| Claim No. | Claimant | Claim Amount | Proposed Monthly Payment | Total Payments |
|---|---|---|---|---|
| 7 | New York City Dept. of Finance | $18,198.66 | $608.65 | $19,476.80 |
| 10 | U.S. Dept. of Treasury - IRS | $36,074.63 | $1,206.50 | $38,608.00 |
| 19 | New York State Dept. of Taxation & Finance | $12,577.59 | $420.65 | $13,460.80 |
| | Totals: | $66,850.88 | $2,235.80 | $71,545.60 |

On the Effective Date of the Plan, each of the above-listed holders of Allowed Priority Tax Claims will receive an initial distribution in the amount of their respective "Monthly Payment" set forth above against its Allowed Priority Tax Claim with the balance to be paid in thirty-two (32) consecutive monthly installment payments so as to be fully paid on or before August 19, 2014. Priority Tax Claims are not classified under the Plan and the holders thereof are not entitled to vote on the acceptance/rejection of the Plan on account of their Allowed Priority Tax Claims.

**4.    Class 1 – Sovereign Bank Secured Claim**

Class 1 consists solely of the claims of Sovereign Bank. Sovereign Bank has a security interest in all of the Debtor's assets, including the proceeds thereof. The Debtor granted this to Sovereign Bank in exchange for two loans, totaling $100,000. The Debtor and Sovereign Bank have agreed to allow the Debtor to use Sovereign Bank's cash collateral in the ordinary course of its business (the "Stipulated Order"), pursuant to the terms expressed in the Stipulated Order, which is incorporated by reference under the Plan and annexed hereto as *Exhibit "D"*. In exchange for the authority to use Sovereign Bank's Cash Collateral, the Stipulated Order

provides and the Debtor agrees that the Plan shall provide for the allowance of Sovereign Bank's claim in the full amount asserted by Sovereign Bank in its proof of claim ($90,500.99), plus (i) $9,000, which represents the unpaid adequate protection payments due to Sovereign for the months of March, April and May 2011 and (ii) all attorneys' fees and costs incurred by Sovereign with respect to this bankruptcy case (the "Sovereign Claim"). Pursuant to the Stipulation, the debtor shall make payments to Sovereign with respect to the Sovereign Claim over a term of three (3) years, with eight (8%) percent annual interest, in thirty six (36) equal monthly installments. The first payment under the Plan will be due on the first day of the first new month following the Effective Date. To satisfy the terms of the Stipulation, the Debtor estimates that it will be required to make monthly payments to Sovereign in the approximate amount of $3,800 per month for a period of thirty-six (36) months ( the "Sovereign Monthly Payment"). Sovereign shall also be entitled to $25,000 in legal fees pursuant to the cash collateral stipulation. The exact amount of the Sovereign Monthly Payment shall be determined on or before the confirmation date. Because Class 1 is impaired, it is entitled to vote on the plan.

**5. Class 2 – Avi Galapo**

Class 2 consists solely of the claim of Avi Galapo. On February 24, 2010, Galapo filed a proof of claim in the amount of $280,216.77, allegedly secured by the assignment of the lease to Galapo. On July 20, 2010, Galapo filed adversary proceeding case #10-03369(mg) seeking a declaration that he had a security interest in the Debtor's commercial lease by way of the alleged assignment and also seeking a declaratory judgment that pursuant to Section 544(a)(3) of the bankruptcy code that the Debtor could not avoid Galapo's security interest in the lease. The Debtor and Galapo resolved the matter, and the settlement terms are incorporated as part of the

Plan. The key elements of the settlement are as follows:

a)      The Debtor has paid the sum of $3,000 which is currently being held in escrow with Galapo's counsel.  The Debtor shall pay to Galapo $4,000 per month (payment to be made on the first of every month) beginning October 1, 2011 and ending December 1, 2012.

b)      The Debtor shall pay to Galapo $3,000 per month (payment to be made on the first of every month) beginning January 1, 2012 and ending February 1, 2015.

c)      The payments set forth in paragraphs 2 and 3 herein (collectively, the "Payments" shall be secured by a contingent assignment (the "Contingent Assignment") of the Lease to be held in escrow (the "Escrow") subject to the provisions of this Stipulation.

d)      The Debtor shall cooperate with Galapo to take all necessary action to effectuate the Contingent Assignment.

e)      The terms of the settlement contemplated in this Stipulation shall be incorporated into the Debtor's plan of reorganization (the "Plan") and the Debtor shall take all reasonable steps necessary to confirm the Plan.

f)      Upon the Debtor's default in any of the Payments and the Debtor's failure to cure said default within ten (10) days after delivery of a notice of default (said notice to be sent to the Debtor by Federal Express), the Escrow shall terminate and the Lease shall be assigned and released to Galapo.  Thereafter, Galapo may immediately take control of the Premises without further order of the Bankruptcy Court or any other court with competent jurisdiction.

g)      Upon receipt of the full amount of the Payments, Galapo hereby releases and forever discharges the Debtor from any and all claims and/or liabilities relating to the subject matter of the Secured Claim and/or Adversary Proceeding and the Secured Claim shall be

deemed paid in full.

h)       Upon execution of this Stipulation, the Debtor hereby releases and forever discharges Galapo from any and all claims and/or liabilities that the Debtor asserted or may have asserted against Galapo prior to the execution of this Stipulation.

Because class 2 Class 1 consists solely of the Allowed Secured Claim held by Sovereign Bank.  As discussed at length above, the allowance of and treatment to be afforded to Sovereign Bank's Secured Claim was provided for, agreed to and approved by the Bankruptcy Court under the Second Cash Collateral Stipulation (including the Debtor's agreement to pay Sovereign Bank's attorneys' fees in connection with the Debtor's chapter 11 case which amounts are also required to be paid under the loan documents between the Debtor and Sovereign Bank).  The terms of the Second Cash Collateral Stipulation are incorporated by reference under the Plan and, in accordance therewith, the Plan provides that Sovereign Bank's Allowed Class 1 Secured Claim totaling $112,237.46 (less any adequate assurance payments made by the Debtor prior to the Effective Date) will be fully paid in thirty-six (36) monthly installments of $3,517.11 each commencing on the Effective Date of the Plan and continuing thereafter until fully paid. Subsequent to Confirmation of the Plan, Sovereign Bank will retain its lien against the Collateral and its rights and remedies with regard thereto as provided for under the applicable loan documents.  The Debtor refers creditors and parties and interest to the Second Cash Collateral Stipulation (*Exhibit "D"* hereto) for all additional terms thereof.

Sovereign Bank's Class 1 Secured Claim is impaired and, thus, Sovereign Bank is entitled to vote on the acceptance or rejection of the Plan.

**5.      Class 2 – Avi Galapo Secured Claim**

Class 2 consists solely of the Allowed Secured Claim of Avi Galapo. As discussed at length above, the allowance of and treatment to be afforded to Mr. Galapo's Claim was provided for and agreed to under the Galapo Settlement Stipulation, the terms of which are expected to be imminently approved by the Bankruptcy Court.  The terms of the Galapo Settlement Stipulation are incorporated by reference under the Plan and, in accordance therewith, the Plan provides that, in full satisfaction of Mr. Galapo's Allowed Class 2 Claim, the Debtor shall pay Mr. Galapo the total sum of $141,000.00 as follows: (a) the release to Mr. Galapo of any sums deposited by the Debtor into escrow with Mr. Galapo's counsel on the Effective Date (expected to total not less than $15,000.00); (b) an initial installment payment of $4,000.00 on the Effective Date of the Plan; (c) consecutive equal monthly installments of $4,000.00 each through December, 2012; and (d) consecutive equal monthly installments of $3,000.00 each from January, 2013 through February, 2015.  As further provided for in the Galapo Settlement Stipulation, the payments required to be made by the Debtor to Mr. Galapo will continue to be secured by the contingent assignment of the Lease executed in his favor.  The Debtor refers creditors and parties and interest to the Galapo Settlement Stipulation (*Exhibit "E"* hereto) for all additional terms thereof.

Mr. Galapo's Class 2 Secured Claim is impaired, it and, thus, Mr. Galapo is entitled to vote on the plan.acceptance or rejection of the Plan.

**6.      Class 3 – General Unsecured Claims.**

Class 3 consists of all other Allowed General Unsecured Claims against the Debtor. Under the Plan, all other General Unsecured Claims include all Claims other than Statutory Fees, Administrative Claims, Priority Tax Claims, Class 1 Secured Claims, and (Sovereign Bank), or

Class 2 Secured Claims. (Avi Galapo). The Claims in Class 3 total $~~925,310.45~~907,650.03 as follows:

| Claim No. | Claimant | Allowed Amount |
|---|---|---|
| 1 | FIA Card Services, NA/Bank of America ~~(Claim #1)~~ | $33,022.78 |
| 2 | FIA Card Services, NA/Bank of America ~~(Claim #2)~~ | $50,062.28 |
| 3 | Hughes Hubbard & Reed LLP ~~(Claim #3)~~ | $187,859.63 |
| 4 | Consolidated Edison Company of New York, Inc. ~~(Claim #4)~~ | $2,900.82 |
| 6 | Uri Moshel ~~(Claim #6)~~ | $281,149.00 |
| 8 | HYCO Restaurant Supply Co. ~~(Claim #8)~~ | $13,405.41 |
| 10 | Internal Revenue Service ~~(Claim #10)~~ | $16,606.27 |
| ~~NYS Department of Taxation and Finance (Claim #17)~~ | | ~~$17,660.42~~ |
| 14 | Amy Banker ~~(Claim #14)~~ | $276,000.00 |
| Schedule F | Bartlett Dairy & Food Service ~~(Scheduled Claim)~~ | $9,000 |
| Schedule F | Crumbs Wholesale LLC ~~(Scheduled Claim)~~ | $500 |
| Schedule F | Imperial Bag & Paper Co., LLC ~~(Scheduled Claim)~~ | $18,543.84 |
| Schedule F | Omar & Bashar ~~(Scheduled Claim)~~ | $16,000 |
| Schedule F | Perkins Paper Inc ~~(Scheduled Claim)~~ | $2,600 |
| | Total: | $ ~~925,310.45~~907,650.03 |

~~The~~Under the Plan ~~provides for a distribution to~~, the Debtor will pay the holders of Allowed Class 3 General Unsecured Claims ~~equaling 5.51% percent~~a total of ~~the amounts~~$55,000.00, representing approximately 6% of their Allowed Claims ~~in full satisfaction of said Claims, which is to be made in~~, by way of three (3) consecutive annual ~~payments~~Pro Rata Distributions of ~~$17,000,~~the sum of $18,333.33 each with the first ~~to be made~~occurring on the Effective Date~~.~~ of the Plan and, thereafter, on the first and second anniversary dates of the Effective Date, in full satisfaction of said claims. Class 3 Claims are impaired under the Plan ~~because they have agreed to accept less than the full amount actually owed and,~~ and, thus, the ~~Debtor will be soliciting votes from the~~ holders of such ~~claims~~ Claims are entitled to vote as to the acceptance or rejection of the Plan.

### ~~7.~~ **Class 4 – ~~Equity Security Holders.~~Interests of Meir Maslavi**

Class 4 consists of the ~~equity share interests~~Interests of Meir ~~Maslavi ("Maslavi"). They will~~ in the Debtor which are not ~~be~~ affected by the ~~Plan and Maslavi shall continue to maintain his 100% interest in the Debtor~~terms of the Plan, *i.e.*, following Confirmation of the Plan. ~~If the unsecured creditors reject the plan then,~~ Mr. Maslavi ~~cannot~~will retain his ~~equity interest. Equity security holders~~100% ownership interest in the Debtor and the Post-Confirmation Debtor. Because he is an "insider" of the Debtor whose Interests are not impaired under the Plan, Mr. Maslavi is not entitled to vote on the Plan ~~because~~on account of his Class 4 Interests.

**Creditors and parties-in-interest should note**, however, that Mr. Maslavi's proposed retention of his Interests under the Plan requires the acceptance of the Plan by voting creditors. Specifically, in accordance with the "absolute priority rule" established under the Bankruptcy Code, shareholders of a debtor cannot ordinarily retain their ~~insider status.~~ shares after confirmation of a chapter plan unless all creditors of the debtor are fully paid under the plan or the shareholders provide the estate with some form of "new value" (*e.g.*, an additional capital infusion) on account of their proposed retention of their shares. An additional exception to the absolute priority rule exists for instances in which in the unsecured creditors of a debtor make an informed vote in favor of the shareholders' proposed retention of their shares, generally on account of the benefits perceived by the unsecured creditors in having present ownership continue to operate the debtor's business and the risks associated with a cessation of the debtor's operations if existing ownership is ousted.

As discussed above, Mr. Maslavi founded the Debtor in 2003 and, since that time, has been the sole manager of the Debtor's day-to-day operations. Since the Debtor's assets do not have any significant value, unsecured creditors' best hope for a recovery on their claims is for the Debtor to continue to operate post-Confirmation under the reorganized debt structure proposed under the Plan. The Debtor believes that Mr. Maslavi's retention of his Interests and continued management of the Debtor's operations post-Confirmation would provide the Debtor and its creditors with the best possible chance of consummating the terms of the Plan. Accordingly, the Debtor requests that its unsecured creditors vote in favor of the Plan and, thereby, authorize Mr. Maslavi's retention of his Interests.

**The Debtor suggests that creditors and parties in interest may wish to consult with counsel concerning the foregoing issues.**

**C.     Distributions Under and Implementation of the Plan**

The ~~payments and distributions~~Distributions contemplated ~~under~~to be made on the Effective Date of the Plan will be funded from ~~Debtor's future earnings.~~ amounts accumulated by the Debtor from its operations during the Chapter 11 Case. Counsel to the Debtor will serve as disbursing agent for the Debtor with regard to the initial Effective Date ~~distributions with the Debtor being responsible for making all future distributions contemplated under the Plan~~Distributions. On the Effective Date of the Plan, the following amounts will be distributed by the Debtor's counsel:

Formatted: Tab stops: -0.75", Left + -0.5", Left + 0", Left + 0.5", Left + 1", Left + 1.5", Left + 2.06", Left + 2.5", Left + 3", Left + 3.5", Left + 3.75", Left

Formatted: Font: Not Bold

| Type/Class | Amount | Comments |
|---|---|---|
| ~~Payment of~~Statutory Fees | $~~2,000~~4,875.00 | Estimated Statutory Fees Owed ~~on~~as of the Effective Date ~~Distributions~~of the Plan |
| Administrative Claims | $28,000.00 | First Monthly Installment Payments by the Debtor to Holders of Allowed Administrative Expense Claims |
| Priority Tax Claims | $2,235.80 | First Monthly Installment Payments by the Debtor to Holders of Allowed Priority Tax Claims |
| ~~Payment on~~Class 1 ~~Allowed Secured Claim of~~ (Sovereign Bank~~)~~ | $3,~~000.00~~517.11 | ~~Represents~~ First Agreed Upon Monthly Installment Payment by the Debtor to Sovereign Bank ~~Pursuant to the Stipulated Order, which is Incorporated by Reference under the Plan.~~ |
| Class 2 (Avi Galapo) | $4,000.00 | First Agreed Upon Monthly Installment Payment by the Debtor to Avi Galapo |
| ~~Payment on~~Class 3 ~~Allowed~~ (General Unsecured Claims~~)~~ | $~~17,000.00~~18,333.33 | ~~Represents 1/3~~First of ~~a Recovery of Approximately 5.51% of the~~Three Annual Pro Rata Distributions to Allowed General Unsecured ~~Claims.~~Creditors |

Formatted: Left
Formatted: Right
Formatted: Left
Formatted: Right
Formatted: Left
Formatted: Right

| | |
|---|---|
| **Total Effective Date Distributions:** | ~~$22,000.00~~60,9 61.24 |

Formatted: Font: Bold
Formatted: Left
Formatted: Right
Formatted: Font: Bold
Formatted: Indent: First line: 0.5"

The ~~ongoing~~post-Confirmation installment payments and Distributions to be made to ~~satisfy~~ the holders of ~~Priority~~Allowed Claims~~, Class 1 Claims, Class 2 Claims and Class 3 Claims~~, shall be made by the Post-Confirmation Debtor from its future earnings. The Post-Confirmation Debtor will be responsible for making these payments.

~~VII~~

## V. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Formatted: Top: 1"

Under §365 of the Bankruptcy Code, a debtor has the right, subject to approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Although not defined in the Bankruptcy Code, an "executory contract" is usually described as a contract under which material performance (other than the payment of money) is due by each party. If an executory contract or unexpired lease is rejected under §365 of the Bankruptcy Code, the "rejection" is treated as a breach of the contract or lease prior to the Petition Date giving rise to a pre-petition unsecured claim. In addition, "rejection" damages are limited in certain contexts under §502 of the Bankruptcy Code. If an executory contract or unexpired lease is assumed, the Debtor has the obligation to cure any default and to perform its obligations thereunder in accordance with the terms of such agreement. ~~Pursuant to Court Order dated April 27, 2010, and section 365 of the Bankruptcy Code, the Debtor assumed its Lease for the commercial premises located at the ground floor and basement in the building at 594 Broadway, New York, New York 10012.~~

~~VIII~~As discussed above, by Order entered by the Bankruptcy Court on April 27, 2010,

the Debtor assumed its Lease with regard to the Premises.  Additionally, as of the Petition Date, the Debtor had been a party to a motor vehicle lease with GMAC pursuant to which the Debtor had leased a 2007 Cadillac Escalade.  Said lease expired by its terms on June 20, 2010.  Pursuant to a stipulation between the Debtor and GMAC approved by the Bankruptcy Court on August 23, 2010, GMAC was granted relief from the automatic stay and, upon information and belief, the leased vehicle was returned to GMAC by the Debtor.  GMAC has not asserted any claim for any post-lease termination damages and any debt that may have been owed by the Debtor to GMAC has been wholly satisfied.

The Debtor is not aware of any other leases or executory contracts to which it may be a party.  The Plan nevertheless provides that all executory contracts and unexpired leases to which the Debtor is a party as of the Effective Date which were not previously rejected, assumed, or assumed and assigned by the Debtor shall be deemed rejected and disaffirmed under the Plan as of the Effective Date in accordance with the provisions and requirements of §§365 and 1123 of the Bankruptcy Code.

## VI.    OBJECTIONS TO AND ESTIMATION OF CLAIMS

Under the Plan, the Debtor may object, on appropriate grounds, to the allowance of any Claim up to ninety (90) days following the Effective Date of the Plan subject to extension by Order of the Bankruptcy Court.  In the event any proof of claim is filed or asserted after the Effective Date, the Debtor shall have ninety (90) days from the date of such filing or notice to object to such Claims, which deadline may be extended by the Court upon motion of the Debtor without notice to Claimants.  Under the provisions of the Plan, and unless otherwise ordered by the Bankruptcy Court, the Debtor reserves the exclusive right to, and shall object to the

allowance of, Claims listed in the Schedules or filed with the Bankruptcy Court with respect to which he disputes liability in whole or in part. All objections shall be litigated to Final Order. The Plan reserves the right of the Debtor to compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.

Under the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. All of the aforementioned claim objection, estimation and resolution procedures are cumulative and are not

necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted method.

The Debtor believes that all of the claims against the estate (that have been asserted as of the date hereof) have been fully reconciled or will be resolved or adjudicated prior to the Confirmation. Thus, the Debtor does not anticipate that any further objections to claims will be pursued.

## VII.  RIGHTS OF ACTION

The  Except as otherwise provided in the Plan provides that , any and all rights or causes of action accruing to the Post-Confirmation Debtor claims arising under any theory of law or fact including, without limitation, those arising under or pursuant to the

Formatted: Top:  1", Bottom:  1"

Bankruptcy Code, ~~accruing to or assertable by the Debtor and/or its estate,~~ shall remain assets of the ~~Post Confirmation~~ estate pursuant to §1123(b)(3)(B) of the Bankruptcy Code on the Effective Date. Pursuant to §1123(b)(3)(B) of the Bankruptcy Code, only the Debtor. ~~The Post Confirmation~~ shall have the right to pursue or not to pursue, or, subject to the terms of the Plan, compromise or settle any claims or Causes of Action owned or held by the Debtor and/or its estate as of the Effective Date. From and after the Effective Date, the Debtor may ~~pursue, abandon,~~ commence, litigate, and settle any Causes of Action ~~or release all reserved~~ rights ~~of action, as appropriate, in accordance with what is~~ to payment or claims that belong to the Debtor that may be pending on the Effective Date or instituted by the Debtor after the Effective Date, except as otherwise expressly provided in the ~~best interests, and for the benefit, of the Post Confirmation Debtor. In connection therewith, the Plan provides that any distributions provided for therein and the allowance of any Claim for the purpose of voting on the~~ Plan ~~is and shall be without prejudice to the rights of the Post Confirmation Debtor to pursue and prosecute any reserved rights of action including without limitation, those arising under or pursuant to the Bankruptcy Code. The Debtor, however, does not believe that any fraudulent conveyances existed~~. Other than as set forth herein, no other Person may pursue such Causes of Action after the Effective Date. The Bankruptcy Court shall retain jurisdiction to adjudicate any and all Causes of Action whether commenced prior to or after the ~~filing of the petition~~ Effective Date.

The Debtor has reviewed its records and ~~further~~ believes that all of its pre-~~petition~~ Petition Date payments and transfers were made in the ordinary course of ~~business thereby eliminating any potential recovery of preferential transfers. The Debtor~~ its business. As such, the Debtor does not believe that any preferential transfers, fraudulent conveyances or other actionable

transfers were made prior to or after the Petition Date. The Debtor further believes that any preference recoveries would be subject to multiple defenses and/or offsets such as new value if sought to be recovered. Accordingly, the Debtor does not believe that there are potential causes of action in its favor which would benefit its estate and, as such, the Debtor does not anticipate possible actions to be commenced that any post-Confirmation litigation will be pursued.

**VIII**

**IX.   LEGAL EFFECTS OF CONFIRMATION OF THE PLAN**

**1.    Binding Effect**

Pursuant to §1141(a) of the Bankruptcy Code, once confirmed, the provisions of the Plan shall be binding upon the Debtor, the Debtors, all Creditorscreditors and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

**2.    Discharge**

Pursuant to §1141(d)(51) of the Bankruptcy Code, upon the completion of all payments required under the Plan, the Bankruptcy Court will enter a discharge of the Debtor from its debts that arose before the Confirmation Date. As such, and except with regard to any liens retained by Sovereign Bank and/or Avi Galapo against any assets of the Debtor as provided for herein, the rights afforded in the Plan and the treatment of all Claims therein shall be in exchange for and in complete satisfaction of all claims of any nature whatsoever (including any interest accrued on such Claims), from and after the Petition Date against the Debtor and its estate except as otherwise provided specified in the Plan, inthe Confirmation Order and/or §1141 of the Bankruptcy Code, or in the Confirmation Order.of the Plan shall discharge the Debtor from any

and all debts arising prior to and after the Petition Date.

       **3.**       **Limitation of Liability in Connection with the Plan**

In accordance with §1125(e) of the Bankruptcy Code, the Plan provides that neither the Debtor nor its ~~counsel~~professionals or agents shall have incurred or shall incur any liability to any holder of a Claim or any other Person for any act or omission in connection with, or arising out of, this Disclosure Statement, the pursuit of approval of this Disclosure Statement, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence ~~misconduct~~.

## IX~~X~~. RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction over this proceeding under the provisions of the Bankruptcy Code, including, without limitation, §1142(b) thereof and the Bankruptcy Rules, to ensure that the intent and the purpose of the Plan is carried out and given effect. Without limitation by reason of specification, the Bankruptcy Court shall retain jurisdiction for the following purposes:

      (a)      To consider any modification of the Plan pursuant to §1127 of the Bankruptcy Code and/or any other modification of the Plan after substantial consummation thereof;

      (b)      To hear and determine:

            (i)      all controversies, suits and disputes, if any, as may arise in connection with the interpretation, implementation, consummation or enforcement of the Plan;

(ii)     all controversies, suits and disputes, if any, as may arise between or among the holders of any Class of Claim and the Debtor including, without limitation, proceedings to determine the allowance, classification, amount, or priority of Claims;

(iii)     all rights or ~~causes~~Causes of ~~action~~Action which may exist on behalf of the estate,

including actions commenced to recover preferential transfers, accounts receivable and other property of the estate;

(iv)     applications for allowance of compensation and expense reimbursement of professionals for periods prior to the Effective Date;

(v)     any and all applications, adversary proceedings and litigated matters;

(vi)     to enter a final decree closing the Chapter 11 Case; and

(vii)     to the extent not expressly provided for above, any and all disputes arising under the Plan and proceedings in aid of the administration and/or consummation of the Plan.

~~XI~~

**X.     CONDITIONS TO CONFIRMATION, EFFECTIVE DATE AND CONSUMMATION OF THE PLAN**

It is a condition to Confirmation of the Plan that (a) the Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan, and (b) the Confirmation Order is satisfactory to the Debtor in form and substance.  The Plan shall not become effective unless and until each of the following conditions has been satisfied or waived:

(a)     The Bankruptcy Court shall have entered the Confirmation Order; and

(b)     The Confirmation Order shall have become a Final Order.

The Debtor may at any time, without notice or authorization of the Bankruptcy Court, waive any or all of the foregoing conditions.  The failure of the Debtor to satisfy or waive such condition may be asserted by the Debtor regardless of the circumstances giving rise to the failure

of such condition to be satisfied (including any actions taken by the Debtor). The Debtor reserves the right to assert that any appeal from the Confirmation Order shall be moot after substantial consummation of the Plan. In the event that the aforementioned conditions have not occurred or been waived on or before ~~sixty (60~~one hundred and eighty (180) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Bankruptcy Court made on the request of the Debtor or any party in interest and an opportunity for parties in interest to be heard.

## ~~XII~~XI. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

The tax consequences of the Plan may impact the decision of the holder of a Claim in determining whether to accept or reject the Plan. Moreover, the tax consequences will vary depending upon the individual circumstances of holder of a Claim.

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan to the holders of Class 3 General Unsecured Claims. The summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. This summary does not address all aspects of federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code and also does not discuss any aspects of state, local, or foreign taxation. Additionally, a substantial amount of time may elapse between the Effective

Date and the receipt of the final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the Internal Revenue Service with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtor as proponent of the Plan with respect thereto. **~~According~~Accordingly, each holder of a Claim should consult his, her or its own tax advisor to determine what effect, if any, the treatment afforded its respective Claim under the Plan may have under federal, state and/or local tax laws, and the laws of any applicable foreign jurisdictions.**

On the exchange of its Claim for cash and/or property, each holder of a Claim in Class 3 will recognize gain or loss measured by the difference between: (a) the aggregate fair market value of the cash and/or property received; and (b) such holder's tax basis in the Claim. To the extent that the cash and/or property received by a holder of a Claim is attributable to accrued interest on such Claim, the cash and/or property received will be deemed made in payment of such interest. Conversely, a holder of a Claim will recognize a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full. The allocation for federal income tax purposes between principal and interest of amounts received in exchange for the discharge of a Claim at a discount is not clear. However, the Debtor intends to treat any amount received by holders of Claims as first allocated to principal.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be

**Formatted:** Bottom: 1"

determined by a number of factors, including but not limited to: (a) the nature or origin of the Claim; (b) the tax status of the holder; (c) whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held; (d) whether the Claim was acquired at a market discount; and (e) whether and to what extent the holder had previously claimed a bad debt deduction with respect to the Claim. Any cash and/or property received by a holder of a Claim after the Effective Date may be subject to the imputed interest provisions of the Tax Code.

No statement in this Disclosure Statement should be construed as legal or tax advice. The ~~Debtors~~Debtor and ~~it's~~its counsel and accountants do not assume any responsibility or liability for the tax consequences the holder of a Claim may incur as a result of the treatment afforded its Claim under the Plan. Again, all holders of Claim are urged to consult with their own tax advisor regarding the potential tax consequences of the Plan.

**CIRCULAR 230 DISCLOSURE: This tax discussion was written to support the promotion or marketing of the Plan. To ensure compliance with requirements imposed by the Internal Revenue Service, we are informing you that this discussion was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax-related penalties that may be imposed on the taxpayer under the Tax Code. Taxpayers should seek advice based on their particular circumstances from an independent tax advisor.**

**~~XIII~~XII.        GENERAL INFORMATION REGARDING CONFIRMATION PROCEDURE AND VOTING**

**A.        Plan Confirmation Process**

**1.        Requirements.**

The requirements for Confirmation of the Plan are set forth in detail in §1129 of the

Bankruptcy Code. The following summarizes some of the more salient requirements for such Confirmation:

(a) <u>Acceptance by Impaired Classes</u>. As discussed in further detail below, except to the extent that the "cramdown" provision of §1129(b) of the Bankruptcy Code may be invoked, each ~~Impaired~~impaired Class of Claims must vote to accept the Plan. "Impaired" is defined in §1124 of the Bankruptcy Code. A Claim is ~~Impaired~~"impaired" unless the Plan leaves unaltered the legal, equitable and/or contractual rights of the holder thereof. In order for the Plan to be accepted by an ~~Impaired~~impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in the ~~Impaired~~impaired Class of Claims must vote to accept the Plan, or the Plan must qualify for "cramdown" of any non-accepting Class pursuant to §1129(b) of the Bankruptcy Code.

<u>Although the Debtor does not anticipate having to resort to the "cramdown" provisions of the Bankruptcy Code, the Debtor suggests that creditors and parties in interest may wish to consult with counsel concerning these provisions.</u>

(b) <u>Feasibility</u>. The Bankruptcy Court is required to find that the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan are likely to be able to do so.

(c) <u>"Best Interests" Test</u>. The Bankruptcy Court must find that the Plan is in the "best interests" of ~~Creditors~~creditors. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a

**Formatted:** Top: 1"

value not less than the amount which such holder would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code on that date.

**2.     Confirmation Hearing**

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the Requirements of §1129(b) of the Bankruptcy Code (the "Confirmation Hearing"). The Confirmation Hearing will be held at the United States Bankruptcy Court for the Southern District of New York, before the Honorable Martin Glenn, One Bowling Green, New York, New York, New York 10004, on ~~July~~December ____, 2011 at ~~10:00~~_____ a.m./p.m.

**3.     Objections to Confirmation**

Any creditor or party ~~–~~in~~–~~ interest wishing to object to Confirmation of the Plan must state such objection in writing and appear at the Confirmation Hearing to pursue same.  Any objection must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy sent to the chambers of the Honorable Martin Glenn, and served upon the following parties so as to be actually received by ~~June~~December ____, 2011 at 5:00 p.m.: (i) ~~The Morrison Law Offices, PC, 2 Grand Central Tower, 140 East 45th Street, 18th~~Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017~~, Attn: Lawrence F. Morrison, Esq.:~~; and (ii) Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004.

**4.     Effect of Confirmation**

~~Upon~~As discussed above, upon entry of the Confirmation Order, the Plan shall be binding upon ~~the Debtor,~~ the Debtor, all Creditors and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

**B.     Voting on the Plan**

1. **Who May Vote**

Pursuant to §1126 of the Bankruptcy Code, only the holders of Claims in Classes that are ~~Impaired~~impaired under the Plan may vote on the Plan.

2. **Classes Under the Plan**

Under the classification scheme provided in the Plan, Class 1 consists of the Allowed Secured Claim of Sovereign Bank, Class 2 consists of the Allowed Secured Claim of Avi Galapo, and Class 3 consists of all Allowed General Unsecured Claims against the ~~Debtors~~Debtor.  Class 4 consists of the Interests of Meir Maslavi in the Debtor.

3. **Impairment of Claims**

Under the Plan, the Claims in Classes 1, 2 and 3 are impaired.  The Interests in Class 4 are not impaired.

4. **Voting**

Being impaired, holders of Claims in Class 1 ~~Claims~~, Class 2 ~~Claims,~~ and Class 3 ~~Claims~~ are entitled to vote on the Plan. Being unimpaired, and because the holder thereof is an "insider" of the Debtor, the Interests in Class 4 are not entitled to vote on the Plan.  This Disclosure Statement is being distributed for informational purposes to all ~~Creditors~~creditors and parties- in -interest without regard to their right to vote on the Plan.  If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for that purpose.

5. **Estimation of Claims for Voting Purposes**

Solely for the purposes of voting on the Plan, and for no other purpose, each holder of an Allowed Claim shall include on its Ballot the amount which such Claimant believes is due to it from the Debtor.  THIS AMOUNT SHALL <u>NOT</u> BE DEEMED IN ANY MANNER TO BE

THE ALLOWED AMOUNT OF SUCH CLAIM.  THE ALLOWED AMOUNT WILL <u>ONLY</u> BE DETERMINED AS PROVIDED IN THE PLAN.  The amount set forth on the Ballot is <u>solely</u> for the purpose of voting upon the Plan and for the calculation of whether the Plan shall have been accepted in accordance with §1129(a) of the Bankruptcy Code.

If a Claimant holds more than one Claim in any one particular Class, all Claims of such holder in such particular Class shall be aggregated and deemed to be one Claim for purposes of determining the number and amount of Claims in such Class voting on the Plan.

**6.      Binding Effect**

Whether a Claimant votes on the Plan or not, such person shall be bound by the terms of the Plan if the Plan shall be confirmed by the Bankruptcy Court.  Unless a Ballot shall be completed and returned in accordance with the approved Bankruptcy Court procedures, a Claimant will not be included in the vote for purposes of accepting or rejecting the Plan or for purposes of determining the number of Persons voting on the Plan.

**7.      Voting Procedure and Deadlines**

In order for your vote to accept or reject the Plan to be tabulated, you must complete, date, sign and properly mail the enclosed Ballot to counsel to the Debtor at the following address: ~~The Morrison Law Offices, PC, 2 Grand Central Tower, 140 East 45th Street, 18th~~ Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, Attn: ~~Lawrence F. Morrison~~ Douglas J. Pick, Esq~~.~~.

Pursuant to Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of

the Plan must be <u>received</u> by counsel to the Debtor at the address set forth above on or before ~~July~~ <u>December</u> ___, 2011 at 5:00 p.m.  Once you have delivered or mailed your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and a hearing. Ballots or votes on the acceptance or rejection of the Plan cannot be transmitted orally or by facsimile.

Any Ballot received by counsel to the Debtor that does not identify the Claimant, or is unsigned, or which does not indicate acceptance or rejection, or (unless Claimant's Claim is listed as undisputed, not contingent and fully liquidated in the Debtor's current schedules of liabilities) does not include the amount believed to be owed such Claimant, shall not be counted as a vote, either to accept or reject the Plan.

You are urged to complete, date, sign, and promptly mail the enclosed Ballot.  Please be sure to complete the Ballot properly and legibly identify the amount of your Claim and the name of the Claimant.

## ~~XIV~~<u>XIII</u>.    FEASABILITY OF THE PLAN

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court must find that <u>the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan are likely to be able to do so.  The Bankruptcy Court must further find that</u> Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor ~~unless contemplated by the Plan.  .__

_____As discussed above, the funds needed to make the Effective Date ~~distributions~~<u>Distributions</u> of the Plan will be on deposit with the Debtor's counsel at the time of Confirmation.  The ~~only~~<u>Plan further provides for ongoing post-Confirmation installment</u>

**Formatted:** Tab stops:  0", Left +  0.5", Left

payments ~~provided for in the Plan that are~~ to be made ~~after the Effective Date are the payments~~<u>by the Post-Confirmation Debtor</u> to the holders of Allowed ~~Secured~~<u>Administrative Expense Claims, Allowed Priority Tax</u> Claims and ~~to the holders of Allowed~~ <u>Allowed Claims in Classes 1 (Sovereign Bank), 2 (Avi Galapo) and 3 (</u>General Unsecured Claims~~.~~<u>).</u>

For purposes of determining whether the Plan meets the "feasibility" requirements of the Bankruptcy Code, the Debtor and its professionals analyzed the future prospects, future income and future liabilities of the Debtor and incorporated their findings into the Projections attached hereto as *Exhibit "~~B"~~.*

~~————~~ <u>C"</u>. As confirmed by the Projections, the Debtor believes that, after the restructuring of its debt obligations provided for under the Plan, the <u>Post-Confirmation</u> Debtor will be able to make all of its ongoing Plan payments while remaining current on its ordinary debts. Accordingly, the Debtor believes that ~~confirmation~~<u>the Plan is feasible and that Confirmation</u> is not likely to be followed by the liquidation or further financial reorganization of the Debtor.

## ~~XV~~<u>XIV</u>. BEST INTERESTS

Notwithstanding acceptance of the Plan by the requisite number of impaired Classes of Claims, the Bankruptcy Court must independently determine that the Plan provides each member of each impaired Class of Claims a recovery that has a value at least equal to the value of the Distribution that each such creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor believes that the Plan is in the best interests of creditors because it <u>mazimizes the value of the Debtor as a going concern and thereby</u> provides for ~~an orderly and expeditious distribution of the Debtor's assets, thus maximizing the~~<u>a</u> recovery ~~to~~<u>by</u> creditors<u> which would</u>

**Formatted:** Top: 1", Bottom: 1"

not be achievable if the Debtor were liquidated. Under the scenario presented under the Plan, holders of General Unsecured Claims will receive a distribution Pro Rata Distributions of 5.51 the total sum of $55,000.00 which will result in a recovery of approximately 6% of the Allowed Amounts of their Claims. In contrast, in the event of a liquidation of the Debtor under chapter 7 of the Bankruptcy Code, it is likely that creditors would receive substantially less or nothing at all on account of their Allowed Claims because: (a) the Debtors' Debtor's assets are substantially encumbered by liens held by Sovereign Bank and Avi Galapo; (b) the substantial additional expenses of administration, including a chapter 7 trustee's commissions and fees for such trustee's counsel, accountants, and other professionals likely to be retained, would be incurred with priority over Allowed General Unsecured Claims, diluting their recovery; and (c) any distribution on Allowed General Unsecured Claims would likely be substantially delayed while expenses of administration of the estate would continue to grow. In order to illustrate this point, the Debtor and its professionals have prepared the Liquidation Analysis attached hereto as *Exhibit "C B"*.

Thus, the Debtor respectfully submits that the Plan is in the best interests of creditors.

## XVI XV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated alternatives to the Plan, including alternative Plan structures and terms; the adoption of a plan of liquidation; and the pursuit of various litigation strategies. While the Debtor has concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims, if the Plan is not confirmed, the Debtor or any other party-in-interest could attempt to formulate and propose a different plan or plans of reorganization. Further, if no plan of reorganization can be confirmed the Debtor's chapter 11 case may be dismissed or converted to a chapter 7 case. In a liquidation case under chapter 7, the proceeds of

the liquidation would be distributed to the respective creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code and contractual priorities.  However, the

Debtor believes that holders of Allowed Claims would receive substantially less or nothing at all

Formatted: Indent: First line:  0"

under chapter 7 because of the administrative costs and commissions associated with a chapter 7 trustee (as discussed more fully above) and because of the liens, encumbrances and exemptions applicable to the Debtor's assets.  Accordingly, the Debtor believes that Confirmation and consummation of the Plan is preferable to the alternatives described above.

## XVIIXVI.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the Confirmation and consummation of the Plan is the best means available to provide the greatest level of recovery to creditors in accordance with their legal and contractual rights.

Consequently, the Debtor urges all holders of Allowed Claims in Class 1, Class 2 and Class 3 to

Formatted: Indent: First line:  0"

vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before 5:00 p.m. on JulyDecember __, 2011.

Dated: New York, New York
May 31November 8, 2011

Respectfully submitted,

THE MORRISON LAW OFFICES, PC
*Proposed Counsel to the Debtors and Debtors-in-`
Possession*

By: _____
Lawrence F. Morrison

By: _____
Meir Maslavi, President

**PICK & ZABICKI LLP**
Counsel to the Debtor

By: _____
Douglas J. Pick, Esq.
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000

**Formatted:** Left, Indent: Hanging: 3", Tab stops: 2", Left + Not at -0.75" + -0.5" + 0" + 2.06" + 3.5" + 3.75"

**Page 31: [1] Inserted Cells**                                    **11/8/2011 1:06:00 PM**

Inserted Cells

**Page 31: [2] Change**                                        **11/8/2011 1:06:00 PM**

Formatted Table

**Page 31: [3] Formatted**                                     **11/8/2011 1:06:00 PM**

Font: 12 pt, Underline

**Page 31: [4] Formatted**                                     **11/8/2011 1:06:00 PM**

Centered, Line spacing:  Double

**Page 31: [5] Formatted**                                     **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [6] Formatted**                                     **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [7] Formatted**                                     **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [8] Formatted**                                     **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [9] Formatted**                                     **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [10] Formatted**                                   **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [11] Formatted**                                   **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [12] Formatted**                                   **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [13] Formatted**                                   **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [14] Formatted**                                   **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [15] Formatted**                                   **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [16] Formatted**                                   **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [17] Formatted**                                   **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [18] Formatted**                                   **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [19] Formatted**                                   **11/8/2011 1:06:00 PM**

Font: 12 pt

Right, Line spacing:  Double

**Page 31: [21] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [22] Formatted**      **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [23] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [24] Formatted**      **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [25] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [26] Formatted**      **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [27] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [28] Formatted**      **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [29] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [30] Formatted**      **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [31] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [32] Formatted**      **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [33] Inserted Cells**      **11/8/2011 1:06:00 PM**

Inserted Cells

**Page 31: [34] Change**      **11/8/2011 1:06:00 PM**

Formatted Table

**Page 31: [35] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [36] Formatted**      **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [37] Formatted**      **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [38] Formatted**      **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [39] Formatted**      **11/8/2011 1:06:00 PM**

**Page 31: [40] Formatted**             **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [41] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [42] Formatted**             **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [43] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [44] Formatted**             **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [45] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [46] Formatted**             **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [47] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [48] Formatted**             **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [49] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [50] Formatted**             **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [51] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [52] Formatted**             **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [53] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [54] Formatted**             **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

**Page 31: [55] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [56] Formatted**             **11/8/2011 1:06:00 PM**

Line spacing:  Double

**Page 31: [57] Formatted**             **11/8/2011 1:06:00 PM**

Font: 12 pt

**Page 31: [58] Formatted**             **11/8/2011 1:06:00 PM**

Right, Line spacing:  Double

Font: 12 pt

**Page 31: [60] Formatted**          **11/8/2011 1:06:00 PM**

Right, Line spacing: Double

**Page 31: [61] Formatted**          **11/8/2011 1:06:00 PM**

Font: 12 pt